No. 2015-1634, -1635

---

# United States Court Of Appeals

## FOR THE FEDERAL CIRCUIT

---

### WIRELESS MEDIA INNOVATIONS, LLC,
*Plaintiffs-Appellant*,

v.

### MAHER TERMINALS, LLC,
*Defendant-Appellee*

AND

### GLOBAL TERMINAL &
### CONTAINER SERVICES, LLC
*Defendant-Appellee*

---

*Appeals from the United States District Court for the
District of New Jersey in No. 2:14-cv-07004-JLL-JAD
and 2:14-cv-07006-JLL-JAD, Judge Jose L. Linares*

---

## BRIEF OF DEFENDANTS-APPELLEES MAHER TERMINALS, LLC. AND GLOBAL TERMINAL & CONTAINER SERVICES, LLC.

R. David Donoghue
Anthony J. Fuga
HOLLAND & KNIGHT LLP
131 S. Dearborn St., 30th Floor
Chicago, IL 60603
(312) 263-3600

Cindy N. Pham
HOLLAND & KNIGHT LLP
633 17th Street
Colorado Plaza Tower 1
Suite 2300
Denver, CO 80202
(303) 974-6651
*Attorneys for Defendants-Appellees*

### CERTIFICATE OF INTEREST

Counsel for Defendants-Appellees Maher Terminals, LLC and Global Terminal Container Services, LLC certifies the following in accordance with Federal Circuit Rule 47.4:

1. The full names of every party or amicus represented by the undersigned are:

   Maher Terminals, LLC and Global Terminal Container Services, LLC.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by the undersigned is:

   The real party in interest is named in the caption.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by the undersigned are:

   Maher is a non-governmental corporation that is 100% owned by Deutsche Bank AG.

   Effective on or about October 3, 2014, the assets and liabilities of Global Terminal & Container Services, LLC were transferred to GCT Bayonne LP, a Delaware limited partnership that is the successor to Global Terminal & Container Services, LLC. GCT Global Container Terminals Inc. is the parent corporation of GCT Bayonne LP, formerly known as Global Terminal & Container Services, LLC. No publicly held corporation owns

10% or more of the stock of GCT Global Container Terminals Inc. or GCT

Bayonne LP, formerly known as Global Terminal & Container Services, LLC.

4. The names of all law firms and the partners or associates that appeared
   for the party or amicus now represented by the undersigned in the trial
   court or agency or are expected to appear in this Court are:

   R. David Donoghue and Anthony J. Fuga, HOLLAND & KNIGHT
   LLP, 131 South Dearborn Street, 30th Floor, Chicago, IL 60603; Phone:
   (312) 263-3600

   Cindy N. Pham, HOLLAND & KNIGHT LLP, 633 17th Street,
   Colorado Plaza Tower 1, Suite 2300, Denver, CO 80202.

Dated:  September 14, 2015        HOLLAND & KNIGHT LLP

                                  */s/ R. David Donoghue*

                                  R. David Donoghue
                                  Anthony J. Fuga
                                  131 South Dearborn Street
                                  30th Floor
                                  Chicago, IL 60603
                                  Tel: (312) 263-3600
                                  Fax: (312) 578-6666
                                  david.donoghue@hklaw.com
                                  anthony.fuga@hklaw.com

                                  Cindy N. Pham
                                  633 17th Street
                                  Colorado Plaza Tower 1
                                  Suite 2300
                                  Denver, CO 80202
                                  Tel: (303) 974-6651
                                  Fax: (303) 974-6659
                                  cindy.pham@hklaw.com


                                  *Attorneys for Defendants-Appellees*

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................... I

TABLE OF AUTHORITIES.................................................................III

STATEMENT OF RELATED CASES ............................................... VII

STATEMENT OF THE ISSUE PRESENTED .........................................1

STATEMENT OF THE CASE....................................................................1

I.    PROCEDURAL BACKGROUND .....................................................1

II.   THE DISTRICT COURT OPINION ................................................2

III.  THE PATENTS-IN-SUIT...................................................................6

    A.   U.S. Patent No. 5,712,789 .........................................................7

    B.   U.S. Patent No. 6,148,291 .........................................................8

    C.   The Claims of the Asserted Patents...........................................9

SUMMARY OF THE ARGUMENT ......................................................13

ARGUMENT ...........................................................................................16

I.    STANDARD OF REVIEW ..............................................................16

II.   NO CLAIM CONSTRUCTION IS NECESSARY .........................16

III.  THE WMI PATENTS ARE NOT PATENT ELIGIBLE .................17

    A.   The law applicable to enforceability pursuant to Section 101 .................17

    B.   The WMI Patents' claims are directed toward an abstract idea ...............20

        1.    The claimed abstract idea is a fundamental practice long prevalent in the shipping industry ....................................21

        2.    The abstract idea of monitoring and reporting the location and load status of containers is not made patent eligible by including tangible items in claim language ......................................23

        3.    Section 101 does not require an extended claim-by-claim analysis...........................................................................28

    C.   The WMI Patents lack an inventive concept...........................31

        1.    The WMI Patents' claims were routine and conventional at the time of filing ..............................................................32

2.   The District Court did not conflate its Section 101 analysis with an invalidity analysis ................................................................. 35

3.   The District Court considered the elements of the WMI Patents' claims in combination and still found the claims to be unenforceable ................................................................................ 36

CONCLUSION ............................................................................................. 43

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.*,
  728 F.3d 1336 (Fed. Cir. 2013) ....................................................20, 29

*Alice Corp. v. CLS Bank Int'l*,
  134 S. Ct. 2347 (2014)...............................................................passim

*Bancorp Services, LLC v. Sun Life Assurance Co of Canada*,
  687 F.3d 1266 (Fed. Cir. 2012) ..........................................3, 16, 29, 37

*Bilski v. Kappos*,
  130 S. Ct. 3218 (2010)...............................................2, 5, 18, 22, 38

*buySAFE, Inc. v. Google, Inc.*,
  765 F.3d 1350 (Fed. Cir. 2014) ......................................14, 24, 26, 42

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat.
  Ass'n*,
  776 F.3d 1343 (Fed. Cir. 2014) ...............................................passim

*CyberFone Sys., LLC v. Celico Phip*,
  885 F.Supp.2d 710 (D. Del. 2012)......................................................2

*Cyberfone Systems, LLC v. CNN Interactive Group, Inc.*,
  558 F.App'x 988 (Fed. Cir. 2014) ...................................................23

*CyberSource Corp. v. Retail Decisions, Inc.*,
  654 F.3d 1366 (Fed. Cir. 2011) ......................................14, 22, 24, 26

*Dealertrack, Inc. v. Huber*,
  674 F.3d 1315 (Fed. Cir. 2012) .......................................................40

*Digitech Image Technologies v. Electronics for Imaging*,
  758 F.3d 1344 (Fed. Cir. 2014) ..................................................24, 25

*Glory Licensing LLC*,
  2011 WL 1870591 (D.N.J. 2011))......................................................2

iii

*Gottschalk v. Benson*,
409 U.S. 63 (1972) ........................................................................26

*Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*,
488 F.3d 982 (Fed. Cir. 2007) ......................................................11

*In re Bill of Lading Transmission & Processing Sys. Patent Litig.*,
681 F.3d 1323 (Fed. Cir. 2012) ....................................................16

*In re BRCA1- and BRCA2- Based Hereditary Cancer Test Patent Litig.*,
774 F.3d 755 (Fed. Cir. 2014) ......................................................34

*In re Katz Interactive Call Processing Patent Litig.*,
639 F.3d 1303 (Fed. Cir. 2011) ....................................................40

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
No. 2014-1506, 2015 WL 4068798 (Fed. Cir. July 6, 2015) ............37

*Internet Patents Corp. v. Active Network, Inc.*,
790 F.3d 1343 (Fed. Cir. 2015) ......................................13, 16, 20

*Mayo Collab. v. Prometheus Labs*,
132 S. Ct. 1289 (2012) ...........................................................passim

*PC Connector Solutions LLC v. Smartdisk Corp.*,
406 F.3d 1359 (Fed. Cir. 2005) ....................................................34

*Planet Bingo, LLC v. VKGS LLC*,
576 F. App'x 1005 (Fed. Cir. 2014) .......................................passim

*Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*,
556 F.3d 1294 (Fed. Cir. 2009) ....................................................11

*Rumsfeld v. Freedom NY, Inc.*,
329 F.3d 1320 (Fed. Cir. 2003) ....................................................25

*SmartGene, Inc. v. Advanced Biological Labs., SA*,
555 F. App'x 950 (Fed. Cir.), *cert. denied*, 135 S. Ct. 58 (2014) ......38

*StoneEagle Servs., Inc. v. Pay-Plus Solutions, Inc.*.
No. 8:13-CV-2240-T-33MAP, 2015 U.S. Dist. LEXIS 15144 (MD Fla. Feb. 9, 2015) ..........................................................................31

*TQP Development, LLC v. Intuit, Inc.*,
  No. 2:12-CV-180-WCB (Feb. 19, 2014 E.D. Tex) ......................................37, 38

*U.S. Philips Corp. v. Sears Roebuck & Co.*,
  55 F.3d 592 (Fed. Cir. 1995) ...........................................................................25

*Ultramercial, Inc. v. Hulu, LLC*,
  722 F.3d 1335 (Fed. Cir. 2013), *vacated sub nom. by* 134 S. Ct.
  2870 (2014).........................................................................................25, 28, 31

*Ultramercial, Inc. v. Hulu LLC*,
  772 F.3d 709 (Fed. Cir. 2014) ..................................................................passim

*Wireless Media Innovations, LLC v. PCI of Virginia, LLC*,
  No. 1:14-cv-01378 (D. Del)............................................................................ vii

*WMS Gaming, Inc. v. Int'l Game Tech.*,
  184 F.3d 1339 (Fed. Cir. 1999) .......................................................................40

## STATUTES

35 U.S.C. § 101 ...............................................................................................passim

35 U.S.C. § 102 .......................................................................................................32

35 U.S.C. § 103 .....................................................................................31, 32, 33, 35

## OTHER AUTHORITIES

MPEP 608.01(c)(2) ...................................................................................................7

Rule 12(b)(6)...........................................................................................................16

# ABBREVIATIONS AND CITATIONS

**Parties:**

"Global" shall mean Global Terminal Container Services, LLC.

"Maher" shall mean Maher Terminals, LLC.

"WMI" shall mean Wireless Media Innovations, LLC.

**Defined Terms:**

"789 Patent" shall mean U.S. Patent No. 5,712,789 entitled "Container Monitoring System and Method."

"291 Patent" shall mean U.S. Patent No. 6,148,291 entitled "Container and Inventory Monitoring Methods and Systems."

"WMI Patents" shall mean the '789 Patent and the '291 Patent, collectively.

"The District Court" shall mean United States District Court for the District of New Jersey in cases No. 2:14-cv-07004-JLL-JAD and 2:14-cv-07006-JLL-JAD

**Citations:**

"JA___" shall mean citation to the Joint Appendix on appeal.

"Opening Brief" shall mean the Plaintiff-Appellant Wireless Media Innovations, LLC's Opening Appeal Brief in this current case, Dkt. 28.

## <u>STATEMENT OF RELATED CASES</u>

No other appeal in or from this action was previously before this or another appellate court.

A case involving a patent-at-issue in this appeal, U.S. Patent No. 5,712,789, is stayed with a pending motion to dismiss on the same grounds, in the U.S. District Court for the District of Delaware pending this appeal: *Wireless Media Innovations, LLC v. PCI of Virginia, LLC*, No. 1:14-cv-01378 (D. Del).

## STATEMENT OF THE ISSUE PRESENTED

Whether the district court correctly held that all claims of U.S. Patent Nos. 6,148,291 and 5,712,789 are directed to patent-ineligible subject matter pursuant to 35 U.S.C. § 101, where they are at most directed to general purpose computers used to automate well-known processes.

## STATEMENT OF THE CASE

### I.    PROCEDURAL BACKGROUND

On November 7, 2014, WMI sued Maher and Global (collectively, "Appellees") for patent infringement of Patent Nos. 6,148,291 ("'291 Patent") and 5,712,789 ("'789 Patent") (collectively, the "WMI Patents").[1]  On January 20, 2015, Appellees moved to dismiss their respective cases on the grounds that none of the claims asserted were directed to patent-eligible subject matter, pursuant to 35 U.S.C. § 101 ("Section 101").[2]

_____

[1] JA94-165; JA166-237 (Wireless Media's Original Complaints in 2:14-cv-07004 and 2:14-cv-07006).
[2] JA240-315; JA318-324 (Appellees' Motions to Dismiss in 2:14-cv-07004 and 2:14-cv-07006).

The District Court granted the Appellees' motions on April 20, 2015, holding that "the '789 and '291 patent claims are directed to no more than a patent-ineligible abstract idea."[3]

## II. THE DISTRICT COURT OPINION

In its decision finding the WMI Patents unenforceable pursuant to Section 101, the District Court made clear that it "considered the submissions and arguments made in support of and in opposition to the instant motions."[4]  Adhering to the Supreme Court precedent, this Court's relevant precedent, and other persuasive authority, the District Court reviewed the patent specifications and claim language of all of the claims and determined that an extended claim-by-claim analysis was not necessary.[5]  The District Court found the asserted claims to be substantially similar and linked to the same abstract idea of "monitoring locations, movement, and load status of shipping containers within a container-receiving yard, and storing,

---

[3] JA22 (Memorandum Opinion ("Decision") in 2:14-cv-07004 and 2:14-cv-07006 at 20).

[4] JA3 (Decision at 1).

[5] JA6; JA8-9 (Decision at 4, 6-7) (citing *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014); *Bilski v. Kappos*, 130 S. Ct. 3218, 3225 (2010); *CyberFone Sys., LLC v. Celico Phip*, 885 F.Supp.2d 710, 715 (D. Del. 2012); *Glory Licensing LLC*, 2011 WL 1870591 (D.N.J. 2011)); *see also id.* at 6 (citing *Ultramercial, Inc. v. Hulu LLC*, 772 F.3d 709, 716-17 (Fed. Cir. 2014) (hereinafter "*Ultramercial II*")).

2

reporting and communicating this information in various forms through generic computer function."[6]  The District Court concluded that independent Claims 1 and 9 of the '789 Patent and Claims 1 and 32 of the '291 Patent were representative for Section 101 purposes because, "[a]s the other claims of the Patents are drawn to similar processes, they suffer from the same infirmity as the representative claims and need not be considered further."[7]

The District Court then carefully and correctly weighed whether it should "decide the question of patent eligibility at the pleading stage and without first construing the claim terms."[8]  The District Court recognized that "claim construction is not an inviolable prerequisite to a validity determination, under § 101."[9]  After

---

[6] *See* JA15-16 (Decision at 13-14) (agreeing with Defendants and rejecting WMI's argument that each asserted claim requires its own analysis); JA260 (Motions to Dismiss at 15) ("As is readily apparent from the foregoing summary, and from the claims themselves as presented in the '789 and '291 Patents and Exhibit III, the claims are substantially similar and, both individually and collectively, are linked to the same underlying and abstract idea: monitoring locations, movement, and load status of shipping containers within a container receiving yard, and storing, reporting and communicating this information in various forms. Therefore, whether considered individually or together for purposes of the Section 101 analysis, they are drawn to patent ineligible subject matter.").

[7] JA8-9 (Decision at 6-7).

[8] JA9 (Decision at 7).

[9] JA11-12 (Decision at 9-10) (citing *Bancorp Servs., L.L.C.*, 687 F.3d 1266, 1273-74 (Fed. Cir. 2012) (internal quotations omitted).

examining the claims, the District Court concluded that the "basic character of the claimed subject matter in dispute in this action is clearly evident to the Court and no further construction of the claims is required."[10]  The District Court demonstrated its full understanding of the scope and limitations of the claims throughout the opinion as the District Court analyzed the claim limitations under Section 101 without difficulty and expressly without construing the claim terms.[11]

In addition to finding the claim elements straightforward, the District Court found there to be "no disputed facts that needed to be resolved to decide this issue."[12]  The District Court expressly acknowledged that claim construction was irrelevant to its holding, and that "even if the Court construes all claim terms in a manner more favorable to Plaintiff, it would still find that none of the claims survive §101."[13]  In making its determination, the District Court appropriately adopted Judge Mayer's approach outlined in his concurring opinion in *Ultramercial II*, holding that there is no presumption of eligibility in a Section 101 analysis.[14]  The court emphasized that

───────────────────

[10] JA9 (Decision at 7) (internal quotations omitted); *see also id.* at 8.

[11] JA16-19 (Decision at 14-17).

[12] JA10 (Decision at 8).

[13] *Id.*

[14] WMI, in a footnote, acknowledges that there is debate regarding whether a presumption of validity should be applied in a Section 101 analysis and does not challenge the District Court's analysis or reasoning. Opening Brief at 27.

to do otherwise "would effectively create a near impossible threshold for a defendant to clear when assessing a patent's subject matter under the test articulated by *Alice* [*Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014)]."[15]

After detailing this legal framework, the District Court applied the two-step analysis set forth in *Alice* and concluded that: (i) the claims of the '789 and '291 Patents are directed to no more than a patent-ineligible abstract idea, and (ii) the claims do not contain any "inventive concept" sufficient to confer patent eligibility pursuant to Section 101. In reaching this conclusion, the District Court found that none of the steps of the representative method claims, viewed either individually or as an ordered combination, "transform the nature of the claim into patent-eligible subject matter."[16] The District Court also considered *Bilski*, and found that the asserted claims failed to meet the machine-or-transformation test since (i) the claims are not tied to a particular machine or apparatus, and (ii) do not transform a particular article into a different state or thing.[17] The District Court considered this further

---

[15] JA12 (Decision at 10).
[16] JA20 (Decision at 18) (citing *Alice*, 134 S. Ct. at 2355) (internal quotations omitted).
[17] JA21-22 (Decision at 19-20).

reason why the asserted claims do not contain anything more than conventional steps, and therefore do not cover patent-eligible subject matter.

## III.  THE PATENTS-IN-SUIT

The WMI Patents are directed to the abstract concept of monitoring and reporting the location and load status of containers.[18]  The abstract concept of monitoring and reporting the location and status of cargo is an old, well-known business concept.  WMI acknowledges that the concept and "some aspects of tracking shipping containers in transit were well developed at the time of [the WMI Patents]."[19]  The fact that the WMI Patents limit use of this abstract idea to a shipping yard does not make it any less abstract.  The WMI Patents do not claim a "new and useful process," as required by Section 101.  Instead, they claim using a generic computer to replace human perception and common sense required for shipping and monitoring containers.

---

[18] *See* JA32 ('291 Patent, Abstract); JA78 ('789 Patent, Abstract).
[19] Opening Brief at 3-4; *see also id.* at 28 ("In essence, the WMI Patents integrate the concept of real-time monitoring to *conventional* yard management operations … .") (emphasis added).

### A.    U.S. Patent No. 5,712,789

The '789 Patent, entitled "Container Monitoring System and Method," was issued by the USPTO from Application No. 08/519,888 (the "'888 Application") filed August 28, 1995. The "Field of the Invention" of the '789 Patent is stated to be the following:

> systems and methods for data acquisition and information management and, more particularly, to data acquisition and information management systems for tracking the location and status of moveable objects.[20]

The '789 Patent's "Background of the Invention" section acknowledges that people tracking containers is well-known in the prior art, albeit in a failed attempt to show that using a database and a general purpose computer to track containers was inventive:[21]

> Modern manufacturing procedures require product assembly parts to arrive just-in-time at assembly facilities to reduce or eliminate parts inventories. This requires discrete tracking of loads and parts arriving at a manufacturing facility, and of part-carrying racks leaving the manufacturing facility, all within different types of shipping containers.[22]

---

[20] JA87 ('789 Patent at 1:5-9; emphasis added).

[21] *See* MPEP 608.01(c)(2) (Background of the Invention) ("Where applicable, the problems involved in the prior art or other information disclosed which are solved by the applicant's invention should be indicated.")

[22] JA87 ('789 Patent at 1:24-38) ("Despite the many improvements in internal manufacturing efficiency, the critical parts supply delivery system has not been improved much beyond simply dropping a shipment at the door of a factory. This approach leaves production management personnel with the task of locating shipments and parts outside of the factory to coordinate final delivery of a shipment at a very specific location (dock or entry door) to a plant.").

The '789 Patent consists of both system claims (Claim Nos. 1 to 8) and method claims (Claim Nos. 9 to 19).

### B.     U.S. Patent No. 6,148,291

The '291 Patent, entitled "Container and Inventory Monitoring Methods and Systems," was issued by the USPTO on November 14, 2000 upon Application No. 09/013,392, filed January 26, 1998 and "related to" the '888 Application.[23]   The "Field of the Invention" of the '291 Patent states:

> [T]he invention pertains to methods and systems which create and maintain an accurate record of the location and movement of containers, racks and inventory within the boundaries and between sites such as factories, assembly plants, warehouses, shipping yards and freight switching facilities.[24]

The "Background of the Invention" provides as follows:

> In the related application [the '888 Application], a method and system is described for monitoring the location and load status of containers within the boundaries of a manufacturing or shipping or warehouse facility. The invention eliminates substantial cost of locating containers within sprawling shipping container receiving yards, so that the container can be readily brought to an assigned dock for unloading.  The present application focuses *even more closely* on the movement and load status of containers in transit and within yards and production facilities such as automobile factories, and describes nonobvious enhancements and additions to the container monitoring methods and systems which yield even more accurate and detailed

---

[23] JA67 ('291 Patent at 1:6).
[24] *Id.* ('291 Patent at 1:11-18).

information on the location and status of containers, shipping racks, and running inventories. . . .[25]

The "Background of the Invention" acknowledges that:

1)  "Tracking of containers in transit [was] well developed, including the use of satellites and other electronic technology to obtain real-time data on in transit locations."[26]

2)  "Inventory accounting and management [was] also a well-developed [field] in which the contents of very large warehouses are ascertainable to high level of detail at any point in time."[27]

The Background merely asserts – without support – that moving these known technologies from other locations into a shipping yard makes such use inventive.[28]

Like the '789 Patent, the '291 Patent's claims also consist of system claims (Claim Nos. 1 to 20) and three groups of method claims (Claim Nos. 21 to 31, 32 to 34, and 35, respectively).

## C.    The Claims of the Asserted Patents

The WMI Patents have 54 claims, including 6 independent claims and 48 dependent claims.  The claims are directed to the fundamental, abstract business idea of providing a system or method for monitoring and reporting the location and load status of containers.

---

[25] *Id.* ('291 Patent at 1:21-35) (emphasis added).
[26] *Id.* ('291 Patent at 1:42-44).
[27] *Id.* ('291 Patent at 1:44-47).
[28] *Id.* ('291 Patent at 1:47-51).

The WMI Patent claims can be considered by each of its six independent claims and their respective dependent claims as summarized in the chart below:

| | |
|---|---|
| The '789 Patent, independent Claim 1 and its dependents (Claims 2 to 8) | a system for **monitoring** the location and load status of shipping containers as they remain stationary or move about a container yard, with the dependent claims adding limitations for **entering**, **receiving**, **recording**, and **communicating** associated information. |
| The '789 Patent, independent Claim 9 and dependent Claims 10 to 19 | **a method of using the system claimed in Claims 1 to 8**, with the dependent claims adding limitations for **recording**, **reporting**, **communicating**, **monitoring**, **verifying** and **generating reports**, **communicating** container movements and monitoring the load status of container racks. |
| The '291 Patent, independent Claim 1 and its dependents (Claims 2 to 20) | a computerized system for **monitoring** the location and load status of shipping containers as they remain stationary or move about a container yard, **communicating** information gathered from monitoring, and **generating reports**, with the dependent claims adding limitations directed to the types of reports that are generated and their contents. |
| The '291 Patent, independent Claim 21 and its dependents (Claims 22 to 31) | **a method of using the system claimed in Claims 1 to 20**, focusing on dock usage rather than container status, with the dependent claims adding limitations directed to the types of reports that are generated and their contents. |

| The '291 Patent, independent Claim 32 and its dependents (Claims 33 to 34)[29] | a method of **monitoring** and **recording** the location and load status of "rush" ("live unload") shipping containers as they remain stationary or move about a container yard, with the dependent claims adding limitations directed to the types of information that are monitored and recorded. |
|---|---|
| The '291 Patent, independent Claim 35 (it has no dependents) | a method of **monitoring** the location of shipping containers in a yard that provides a graphical representation of slot availability locations for containers in the yard. |

The claims are not bound to a particular field of use by describing a generic computer, a communications device, and network components in combination with other conventional and long-used equipment and facilities within a container yard. The claims overlap each other significantly.    The District Court, therefore, reasonably looked to several exemplary claims.  For example, independent Claim 9 of the '789 Patent was one such claim:[30]

---

[29] WMI states in its Opening Brief that it volunteered that it would not be asserting '291 Patent claims 21 and 35 or any claims depending from them.  WMI, however, incorrectly assumes that there is no longer a controversy based upon its statement. *See Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 995-96 (Fed. Cir. 2007) (holding that the court retained subject matter jurisdiction over withdrawn claims because patentee chose to continue to assert associated dependent claims which covered the same technology). There remains controversy, at least until WMI provides to Appellees a covenant not to sue, which it has not yet done as of the time of this filing.  *See Revolution Eyewear, Inc. v. Aspex Eyewear, Inc*., 556 F.3d 1294, 1300 (Fed. Cir. 2009).  Therefore, this brief addresses all claims of the WMI Patents, just as the District Court briefing did.  *See* JA19 (Decision at 17).

[30] JA7-9 (Decision at 5-7).

9.  A method for monitoring location and load status of shipping containers comprising the steps of:

- identifying carriers and containers by identification codes at a point of entry to a facility,

- recording identification codes of containers to be monitored,

- moving a container from the point of entry to a receiving area and recording the location of the container within the receiving area,

- moving a container from a receiving area via a switching vehicle to a final destination according to instructions received from the facility and recording the location of the final destination of the container,

- moving the container from the final destination to a receiving area and recording the receiving area location of the container and the status of a load in the container.[31]

Claim 9 of the '789 Patent is a generic method for monitoring shipping containers that amounts to little more than human perception and common sense.[32]

The District Court also considered independent Claim 1 of the '291 Patent as exemplary:[33]

1.  A computerized system for monitoring and recording location and load status of shipping containers relative to a facility with an associated yard defined by a boundary within which containers are to be monitored by the system, and a controlled entry point to the boundary, the system comprising:

---

[31] JA91 ('789 Patent at claim 9).

[32] *See* JA18 (Decision at 16); JA20-21 (Decision at 18-19) ("Indeed, the steps of monitoring, recording, and inputting information represent insignificant data-gathering steps … and thus add nothing of practical significant to the underlying abstract idea.") (internal quotation omitted).

[33] *See* JA6 (Decision at 4).

12

- means for recording identification codes of containers which enter the boundary,

- means for communicating and recording information on movements, location and load status of containers within the boundary in response to movement and changes in location and load status of containers made according to instructions received from the facility,

- means for generating reports of recorded information on locations and load status of containers within the boundary, and

- means for generating reports on container locations and load status relative to designated docks associated with a facility.[34]

## SUMMARY OF THE ARGUMENT

The WMI Patents violate Section 101 as a matter of law. The Supreme Court's decision in *Alice* and the subsequent decisions of this Court uniformly hold that generic computer implementation of an abstract idea is not patent-eligible. In those cases, just as here, the claims add only generic computers performing generic functions to an otherwise abstract idea and thus are devoid of any inventive concept "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself."[35]

---

[34] JA75 ('291 Patent at claim 1).

[35] *Alice*, 134 S. Ct. at 2355 (quoting *Mayo Collab. v. Prometheus Labs*, 132 S. Ct. 1289, 1294 (2012)); *see also Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d

The WMI Patents are unenforceable under a straightforward application of the two-step framework reaffirmed in *Alice*.[36] First, the WMI Patents are directed toward an abstract idea. They represent no "more than a drafting effort designed to monopolize the abstract idea" of monitoring and reporting the location and load status of containers.[37] The WMI Patents frame this one abstract idea in multiple overlapping ways, but at no point do they claim anything more. Although WMI argues that the inclusion of physical components precludes the WMI Patents from being directed to an abstract idea,[38] this is directly contrary to the controlling law.[39]

---

1343, 1346 (Fed. Cir. 2015) ("Although computer capability achieved financial activity of a scope not previously available, no inventive concept was found in the claims, for the computer functions are well-understood, routine, conventional activities' previously known to the industry.") (internal quotations omitted); *Content Extraction*, 776 F.3d at 1348; *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014).

[36] *Alice*, 134 S. Ct. at 2349-52.

[37] *Id.* at 2357.

[38] Opening Brief at 14-15.

[39] *Alice*, 134 S. Ct. at 2358. *See also buySAFE*, 765 F.3d at 1354 ("[A] claim directed to an abstract idea does not move into section 101 eligibility territory by merely requiring generic computer implementation.") (international quotations omitted); *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1375 (Fed. Cir. 2011) ("[T]he basic character of a process claim drawn to an abstract idea is not changed by claiming only its performance by computers, or by claiming the process embodied in program instructions on a computer readable medium.").

14

Second, the WMI Patents do not supply the requisite "inventive concept" required to transform the claimed abstract idea into a patent-eligible invention. The WMI Patents create nothing new or inventive. The WMI patents merely recite the abstract business practice of monitoring and reporting the location and load status of containers – something done for generations – and tie it to a general purpose computer. The WMI Patents do not disclose, teach, or require a specially-programmed computer. In fact, several claims of the WMI Patents do not require a computer of any kind.[40]

For all of these reasons, the District Court, after carefully considering the record, properly found the WMI Patents to be patent-ineligible and, therefore, unenforceable.

---

[40] *See e.g.*, JA91-92 (the '789 Patent at Claims 9-19 (reciting steps of identifying carriers and containers; recording container identification codes, load status, and location; moving containers; reporting load status; defining a monitoring boundary; communicating container movement; monitoring container load status and racks; entering data into container monitor control system; verifying recorded container locations; and generating reports without limitation to computer)); *see also* JA76-77 (the '291 Patent at Claims 32-35 (reciting steps of identifying containers; recording container information; and providing a graphical representation without limitation to a computer)).

# ARGUMENT

## I.    STANDARD OF REVIEW

The Federal Circuit reviews a dismissal for failure to state a claim pursuant to the law of the regional circuit – here, the Third Circuit.[41]  Thus, a decision pursuant to Rule 12(b)(6) is given plenary review.[42]  The Federal Circuit reviews a district court's decision holding claims unenforceable pursuant to Section 101 *de novo*.[43]

## II.    NO CLAIM CONSTRUCTION IS NECESSARY

Predictably, WMI argues that it is improper to resolve this issue without claim construction.  WMI's reliance on claim construction and fact-finding to determine whether the WMI Patents claims satisfy the Section 101 standard is misplaced.  Patent-eligibility is a question of law, and no formal claim construction or fact finding is necessary to dispose of this case pursuant to Section 101.[44]  The District Court appropriately decided the Section 101 issue prior to claim construction.

In *Bancorp Services*, this Court "perceive[d] no flaw" in the district court declining "to construe numerous *disputed terms* prior to considering" Section 101.[45]

---

[41] *In re Bill of Lading Transmission & Processing Sys. Patent Litig*., 681 F.3d 1323, 1331 (Fed. Cir. 2012).
[42] *Content Extraction*, 776 F.3d at 1346.
[43] *Id.* at 1357.
[44] *See Internet Patents Corp.*, 790 F.3d at 1348.
[45] *Bancorp Services, LLC v. Sun Life Assurance Co of Canada*, 687 F.3d 1266, 1273 (Fed. Cir. 2012) (emphasis added).

Claim construction is even less of an issue in the instant case, where WMI fails to dispute how claim construction would change the District Court's holding. WMI does not offer constructions that would save the WMI patents because such constructions do not exist. The District Court acknowledged this, holding that "even if the Court construes all claim terms in a manner most favorable to [WMI], it would still find that none of the claims survive §101."[46]

WMI's ineligibility pursuant to Section 101 is readily apparent as a matter of law. The claims, on their face, involve nothing more than the abstract idea of monitoring cargo and describing the idea in readily apparent steps. Claim construction will not alter this conclusion.

## III.    THE WMI PATENTS ARE NOT PATENT ELIGIBLE

### A.    The law applicable to enforceability pursuant to Section 101

Despite the relative breadth of statutorily patent eligible subject matter,[47] the Supreme Court has recognized that there are several exceptions to patent eligibility,

---

[46] JA10 (Decision at 8).

[47] 35 U.S.C. § 101 ("Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.").

specifically: laws of nature, natural phenomena, and abstract ideas.[48]    Long-established, fundamental concepts are necessarily abstract ideas that are "the basic tools of scientific and technological work" and, as such, are ineligible for patent protection.[49] Although particular applications of abstract ideas may be patentable, courts must distinguish between patents that merely claim an abstract idea and patents that "integrate the [abstract idea] into something more, thereby transforming [it] into a patent-eligible invention."[50]

The Supreme Court has established a two-part test to perform the required analysis: (i) the court must first determine whether the patent claims at issue are directed to one of the patent-ineligible concepts; and (ii) if they are, the court must decide whether the claims set forth an "inventive concept" that ensures that the patent amounts to more than the ineligible concept.[51]

Part two of the test requires that the "patent in practice amounts to significantly more than a patent upon the [abstract idea] itself."[52]    "[C]onventional

_____

[48] *Alice*, 134 S. Ct. at 2354.
[49] *Bilski*, 130 S. Ct. at 3218, 3225; *Mayo*, 132 S. Ct. at 1293.
[50] *Alice*, 134 S. Ct. at 2354-55.
[51] *Id.* at 2347 (quoting *Mayo*, 132 S. Ct. at 1303).
[52] *Id.* at 2355.

steps specified at a high level of generality" do not reflect an "inventive concept."[53]

In *Alice*, the Court adhered to its holding in *Mayo* that elements which add nothing

beyond what is well-known cannot render a claim patent eligible.[54]   Similarly,

merely reciting "generic computer components configured to implement [the

abstract] idea" is not inventive.[55]   Abstract ideas cannot become patentable merely

by "'draftsman's art,'" or by trying to dress up an abstract idea with inconsequential

steps or features.[56]   Adding "'well-understood,'" "'routine,'" or "'conventional'"

activities or features "previously known to the industry" to an abstract idea

contributes nothing inventive and does not make an abstract idea patentable.[57]

The Supreme Court's two-part patent eligibility test applies across technology

and industry sectors.   Despite this, WMI attempts to distinguish the WMI Patents

from those found unenforceable pursuant to Section 101 post-*Alice* by arguing that

many of those unenforceable patents were in the financial transactions space.

Neither this Court nor the Supreme Court has ever limited its two-part analysis to

financial transactions.   In fact, this Court has utilized this methodology, both before

---

[53] *Id.* at 2350.
[54] *Id.* at 2359 (citing *Mayo*, 132 S. Ct. at 1294).
[55] *Id.* at 2351.
[56] *Id.* at 2359.
[57] *Id.* at 2359 (quoting *Mayo*, 132 S.Ct. at 1294).

and after *Alice*, and found multiple patents across industries outside of the financial

transaction space to be unenforceable pursuant to Section 101.[58]

### B.    The WMI Patents' claims are directed toward an abstract idea

The District Court properly held that the WMI Patents "are directed to the

same abstract idea: monitoring locations, movement, and load status of shipping

containers within a container-receiving yard, and storing, reporting and

communicating this information in various forms, sometimes through generic

computer functions."[59]  The WMI Patents' common abstracts elucidate this abstract

idea:

> A container monitoring system and method tracks location and load
> status of shipping containers within a defined premises and generates

---

[58] *See, e.g.*, *Internet Patents Corp.*, 790 F.3d at 1349 (holding claims directed to a method of, and a system for, entering information into online forms in a manner that prevented a loss of information by "maintaining a state" were unenforceable pursuant to Section 101); *Content Extraction*, 776 F.3d at 1245 (holding a patent unenforceable whose claims recited a "method of 1) extracting data from hard copy documents and using an automated digitizing unit such as a scanner, 2) recognizing specific information from the extracted data, and 3) storing that information in a memory"); *Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1006 (Fed. Cir. 2014) (holding a patent unenforceable whose claims "recite computer-aided methods and systems for managing a game of bingo"); *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1339, 1342 (Fed. Cir. 2013) (determining that claims to automated methods for generating task lists to be performed by an insurance organization were directed to a patent-ineligible abstract idea).

[59] JA16 (Decision at 14).

container status reports for customers receiving containers, suppliers or shippers of goods, and container carriers. Carrier and container identifiers are used to track and monitor movements and status of each container for a point of departure to a final destination and return. A combined computer and telecommunication system is also disclosed for executing the tasks of the container monitoring system.[60]

Tracking and/or monitoring cargo, itself, is an abstract idea that has been well-known. WMI does not attempt to argue against this because it is clear from the WMI Patents.[61] The WMI Patents' claims are all directed to this abstract idea, as demonstrated in the table above, at III.C.

### 1. The claimed abstract idea is a fundamental practice long prevalent in the shipping industry

Freight has been monitored and tracked as long as goods have been shipped by common carrier; WMI cannot dispute this.[62] Abstract ideas are ineligible for patent protection because "they are the basic tools of scientific and technological

---

[60] JA78 ('789 Patent at abstract); *see also* JA32 ('291 Patent at abstract).

[61] *See, e.g.*, JA73 ('291 Patent at 13:7-8) ("Containers are commonly tracked in transit by satellites or other electronic signaling and tracking devices.'); JA67 ('291 Patent at 1:42-47) ("Tracking of containers in transit is well developed, including the use of satellites and other electronic technology to obtain real-time data on in transit locations. Inventory accounting and management is also a well developed [field] in which the contents of very large warehouse are ascertainable to high level of detail at any point in time.").

[62] *See id.*

work,"[63] and should be "free to all men and reserved exclusively to none."[64]  Section 101's policy rationale is the avoidance of harmful and unfair monopolies on abstract ideas, to the detriment of scientific innovation and the public interest.[65]  Like other claims rejected as patent ineligible pursuant to Section 101, the claims of the WMI Patents would effectively preempt any other use of the underlying abstract idea.[66]

In *Alice*, the Supreme Court adhered to the *Mayo* reasoning, holding that elements that add nothing beyond what is well-known cannot render a claim patent-eligible.[67]  The Supreme Court explained that using a computer to complete the "well-understood, routine, conventional activit[ies]" previously known in the industry does not constitute Section 101 patent-eligible material.[68]  Here, as in *Alice*, the well-known and conventional activity of monitoring and reporting the location and load status of containers is not patent-eligible solely because a computer is used

_____

[63] *Bilski*, 130 S. Ct. at 3225.

[64] *Mayo,* 132 S. Ct. at 1293.

[65] *See Bilski*, 130 S. Ct. at 3231 (validating the patents at issue would preempt the use of basic concepts or algorithms, "and would effectively grant a monopoly over an abstract idea.").

[66] *See, e.g.*, *CyberSource*, 654 F.3d at 1372 ("Claim 3 does not limit its scope to any particular fraud detection algorithm . . . Rather, the broad scope of claim 3 extends to essentially any method of detecting credit card fraud based on information relating past transaction to a particular 'Internet address' . . . .").

[67] *Alice*, 134 S. Ct. at 2359.

[68] *See id.*

to complete this process.  The WMI Patents fail because – at most – they claim using generic components and a general purpose computer to perform the abstract business concept that has been essential to cargo shipping and management for centuries. [69] The WMI Patents would preempt vast areas of container monitoring and related information management that have long been part of the public domain.  Such basic concepts are not patentable pursuant to Section 101.[70]

### 2. The abstract idea of monitoring and reporting the location and load status of containers is not made patent eligible by including tangible items in claim language

WMI spends much of its Opening Brief citing to limited physical items listed in WMI Patents' claims.  For instance, WMI points to "data input terminals, code scanners, and RFID tags," along with "a mainframe computer, a database, and a user terminal with a graphical screen."[71] Later, WMI points to a "switcher" and the physical act of moving containers.[72]  None of these physical aspects of the claims – alone or in the aggregate – save the WMI Patents.[73]  As the District Court correctly

---

[69] *See id.* at 2354-55.

[70] *Id.*; *see also Content Extraction*, 776 F.3d at 1348 (Fed. Cir. 2014); *Cyberfone Systems, LLC v. CNN Interactive Group, Inc.*, 558 F.App'x 988, 991 (Fed. Cir. 2014).

[71] Opening Brief at 18.

[72] Opening Brief at 19-20.

[73] WMI's reliance upon a mainframe computer, database, and user terminal with a screen is also unsuccessful.  Just like the other physical aspects relied upon, these

recognized, WMI's claims "require physical steps and include the use of tangible components is beside the point; the claims merely recite the abstract idea of monitoring and reporting the location and load status of containers."[74]

Pointing to *Digitech*, WMI argues that, so long as the supposed invention falls under one of the four subject matter categories (i.e., process, machine, manufacture, or composition of matter), the claim is patent-eligible and therefore precludes a Section 101 analysis.[75]  However, neither *Digitech* nor any other precedent support this proposition.  *Digitech* made a point to note that "[c]laims that fall within one of the four subject matter categories may nevertheless be ineligible if they encompass laws of nature, physical phenomena, or abstract ideas."[76]  The fact that a claimed

---

are purely functional and generic, and fail to offer anything meaningful beyond the abstract idea. *See Alice*, 134 S. Ct. at 2360; *buySAFE*, 765 F.3d at 1354 ("[A] claim directed to an abstract idea does not move into section 101 eligibility territory by merely requiring generic computer implementation.") (international quotations omitted); *CyberSource*, 654 F.3d at 1375 ("[T]he basic character of a process claim drawn to an abstract idea is not changed by claiming only its performance by computers, or by claiming the process embodied in program instructions on a computer readable medium.").  Furthermore, as discussed in Section III.C., general purpose computers alone cannot make an abstract idea patentable. *See Alice*, 134 S. Ct. at 2354-55.

[74] JA16 (Decision at 14.)

[75] Opening Brief at 14 (citing *Digitech Image Technologies v. Electronics for Imaging*, 758 F.3d 1344 (Fed. Cir. 2014)).

[76] *Digitech*, 758 F.3d at 1350 (internal citation omitted).

invention is a "concrete thing, consisting of parts, or of certain devices and combination of devices," (a machine) does not automatically confer patent eligibility.[77] *Digitech* further noted that, "The Supreme Court recently reaffirmed that fundamental concepts, by themselves, are ineligible abstract ideas."[78] Accordingly, WMI may not circumvent a Section 101 analysis by merely citing physical components.

WMI further relies upon the vacated *Ultramercial I* to support its argument that certain claims are not abstract because they include the use of tangible components, such as an "entry point," "switching vehicles," and "a mainframe computer hosting a database."[79] Even if *Ultramercial I* were not vacated,[80] WMI's argument fails because WMI both misconstrues and oversimplifies the law. As discussed above, an abstract idea is not rendered patentable because of connections

---

[77] *See id.* at 1349-50 (internal citations omitted).

[78] *Id.* at 1350 (citing *Alice*, 134 S. Ct. at 2356).

[79] Opening Brief at 17 (citing *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1340 (Fed. Cir. 2013), *vacated sub nom. by* 134 S. Ct. 2870 (2014) (hereinafter "*Ultramercial I*")).

[80] As noted by this Court, "a vacated judgment 'has no preclusive force either as a matter of collateral or direct estoppel or as a matter of the law of the case.'" *Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320, 1332 (Fed. Cir. 2003) (quoting *U.S. Philips Corp. v. Sears Roebuck & Co.*, 55 F.3d 592, 598 (Fed. Cir. 1995)).

to the physical world.[81]  This is further confirmed in *Content Extraction*, in which the court found the claims were still "drawn to the basic concept of data recognition and storage" and patent ineligible under Section 101 even though the patent claims recited use of a computer and scanner or another automated digitizing unit to process hard copy documents.[82]  Here, as emphasized in these decisions, "the mere recitation of [tangible components and]  a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention."[83]  Although WMI also cites to *CyberSource* to support its argument that physical steps, such as moving a container, demonstrate that the WMI Patents' claims do not merely teach a mental process,[84] *CyberSource* holds that physical steps alone will not confer patentability.[85]

---

[81] *See, e.g.*, *buySAFE*, 765 F.3d at 1353 (explaining that "certain claims that by their terms read on a human-made physical thing or a human-controlled series of physical acts" may nonetheless "fall[] outside section 101"); *see also Gottschalk v. Benson*, 409 U.S. 63, 73-74 (1972) (finding a claim drawn to an unpatentable abstract idea even though it specifically recited the use of a physical computer memory component).

[82] *Content Extraction*, 776 F.3d at 1347-48.

[83] *Id.* at 1348; *Alice*, 134 S. Ct. at 2358.

[84] Opening Brief at 20 (citing *CyberSource*, 654 F.3d at 1368).

[85] *CyberSource Corp.*, 654 F.3d at 1372 (affirming that a method for verifying the validity of credit card transactions over the internet was drawn to unpatentable subject matter and emphasizing that "even if some physical steps are required to obtain information from the database (e.g., entering a query via a keyboard, clicking a mouse), such data-gathering steps cannot alone confer patentability.") (internal citations omitted).

The Federal Circuit reiterated this principle in *Planet Bingo*, in which it held that system and method claims directed toward playing and/or managing a bingo game are abstract ideas and not patent-eligible.[86]   The patent claims at issue in *Planet Bingo* included the bingo player receiving a receipt with her bingo numbers [a tangible object] and the player indicating that she won [a physical action].[87]

Under WMI's argument, the *Planet Bingo* patent claims would be enforceable due to their physical aspects - bingo numbers, bingo cards, receipts, and a manager. Using WMI's theory, the *Planet Bingo* patent claims could also be saved had they included language that said a "bingo game takes place within a bingo hall" or a "bingo player takes the receipt to her chair."  WMI's position is untenable both in light of the law and due to the draftsman's loophole it would create.[88]   The *Planet Bingo* patents were correctly found to be unenforceable as should the WMI patent claims.  Likewise, WMI's attempt to use a "switcher vehicle," an "entry point," the

---

[86] *Planet Bingo*, 576 Fed. App'x. at 1008-09.

[87] JA666-683 (U.S. Patent No. 6,398,646, 9:10-12; 10:7-11); *see also* JA684-702 (U.S. Patent No. 6,656,045, 9:27-30; 10:23-27).

[88] *Alice*, 134 S. Ct. at 2359 (emphasizing that the mere inclusion of physical steps will not automatically confer patentability because "[s]uch a result would make the determination of patent eligibility 'depend simply on the draftsman's art,' thereby eviscerating the rule that 'laws of nature, natural phenomena, and abstract ideas are not patentable.'") (internal citations omitted).

physical act of "moving," and the like to save its patents should fail.  The WMI

Patents may not bypass the rule against patenting abstract ideas with "draftsman's

art" – expressing the abstract idea as a series of routine steps (e.g., using a "switcher"

to move containers).  This is prohibited and does not cure the fact that the WMI

Patents' claims are directed toward an abstract idea.[89]

### 3.    Section 101 does not require an extended claim-by-claim analysis

Contrary to WMI's assertions, an extended claim-by-claim analysis is not

necessary where the claims are "substantially similar and linked to the same abstract

idea."[90]   WMI again ignores *Ultramercial II* and instead relies upon the vacated

*Ultramercial I* decision to argue that "the question of eligible subject matter must be

determined on a claim-by-claim basis."[91]   As no material differences exist among

the claims of the WMI Patents for Section 101 purposes, these claims should be

analyzed together, in similar fashion.[92]   This is especially true if the claims do not

---

[89] *Alice*, 134 S. Ct. at 2354; *Ultramercial II*, 772 F.3d at 715 ("Although certain additional limitations, such as consulting an activity log, add a degree of particularity, the concept embodied by the majority of the limitations describes only [an] abstract idea…").
[90] *Content Extraction*, 776 F.3d at 1348.
[91] Opening Brief at 15 (citing *Ultramercial I*, 722 F.3d at 1340).
[92] *See, e.g.*, *Alice*, 134 S. Ct. at 2359-60 (holding nearly 250 claims across four patents unenforceable without conducting a claim-by-claim analysis); *Content*

include any elements that would change the Section 101 analysis.[93] The fact that the dependent claims include additional limitations related to monitoring, storing, reporting and communicating information does not render the claims any less abstract.[94] Here, a detailed analysis of each and every claim would be redundant and impractical since the analysis would be the same for each claim. [95] Whether considered individually or together for purposes of the Section 101 analysis, the WMI Patent claims are drawn to patent ineligible subject matter. WMI's argument

_____

*Extraction*, 776 F.3d at 1348-49 (finding the claims of the asserted patents to be substantially similar and claim 1 of each asserted patent to be representatives); *Planet Bingo*, 576 Fed. App'x. at 1007 ("[T]here is no meaningful distinction between the method and system claims or between the independent and dependent claims. The system claims recite the same basic process as the method claims, and the dependent claims recite only slight variations of the independent claims."); *Accenture Global Servs.*, 728 F.3d at 1344 (holding that when claims "contain only minor differences in terminology [but] require performance of the same basic process, they should rise or fall together."); *Bancorp*, 687 F.3d at 1276-77.

[93] *See Alice*, 134 S. Ct. at 2359-60 (holding nearly 250 claims across four patents unenforceable without conducting any claim-by-claim analysis).

[94] *Content Extraction*, 776 F.3d at 1349 ("Indeed, all of the additional limitations in the claims cited in CET's appeal brief recite well-known, routine, and conventional functions of scanners and computers. Thus, while these claims may have a narrower scope than the representative claims, no claim contains an 'inventive concept' that transforms the corresponding claim into a patent-eligible application of the otherwise ineligible abstract idea.").

[95] *See Planet Bingo*, 576 Fed. Appx. at 1007 ("[T]here is no meaningful distinction between the method and system claims or between the independent and dependent claims . . . the dependent claims recite only slight variations of the independent claims.").

ignores controlling precedent which expressly permits claims to be analyzed together for purposes of a Section 101 analysis.[96]

WMI asserts that the claims of the WMI Patents are not substantially similar and proceeds to list a number of claims that supposedly include limitations that create dissimilarities.[97] But WMI's descriptions of these claims only prove their similarity; mentioning physical aspects of the claims does not make them dissimilar. For instance, the fact that a container is identified as moving, as opposed to stationary, does not make a claim dissimilar.[98] The entire abstract idea revolves around monitoring and reporting the location of containers as they are moved. If the container did not move, there would be no reason to monitor its location. The same goes for WMI's references to switcher vehicles or an entry point.[99] These physical aspects of the abstract idea do not make these patent claims dissimilar.[100] An extended claim-by-claim analysis is not necessary where the claims are substantially

---

[96] *See, e.g.*, *Content Extraction*, 776 F.3d at 1348 (holding that an extended claim by claim analysis is not necessary where multiple claims are substantially similar and linked to the same abstract idea).

[97] Opening Brief at 16-22.

[98] Opening Brief at 20 (citing JA91 ('789 Patent 10:30-45)).

[99] *See, e.g.*, Opening Brief at 16-20.

[100] *See Content Extraction*, 776 F.3d at 1348.

similar and all linked to the same abstract idea,[101] which WMI's patents undoubtedly are, as described above at III.C.

Furthermore, there is no requirement that a court explain in detail how the claims are substantially similar or require a party present evidence in support of similarity for a Section 101 analysis. WMI, again, relies on the vacated *Ultramercial I* decision as well as *StoneEagle Servs., Inc. v. Pay-Plus Solutions, Inc.*, which assesses invalidity pursuant to Section 103, not Section 101.[102]

## C.    The WMI Patents lack an inventive concept

The WMI Patents do not include additional features that could qualify as "inventive concepts" sufficient to "'transform' the claimed abstract idea into a patent-eligible application."[103]    To confer patent eligibility, patent claims must amount to "significantly more" than the abstract idea, for example by "improv[ing] an existing technological process," and not merely by "implement[ing] [the abstract idea] on a computer."[104]

Instead of attempting to point to additional features that transform the abstract idea into a patent-eligible application, which WMI cannot, WMI attempts to create

---

[101] *Ultramercial II*, 772 F.3d at 712.

[102] Opening Brief at 15-16 (citing *Ultramercial I*, 722 F.3d at 1340; *StoneEagle Servs., Inc. v. Pay-Plus Solutions, Inc.*. No. 8:13-CV-2240-T-33MAP, 2015 U.S. Dist. LEXIS 15144 (MD Fla. Feb. 9, 2015).

[103] *Alice*, 134 S. Ct. at 2355.

[104] *Id.* at 2358.

issues with the District Court's opinion where there are none. WMI incorrectly argues that the District Court made three errors: (1) the District Court allegedly neglected to evaluate patentability at the time of filing for the WMI Patents; (2) the District Court allegedly conflated Section 101 with validity pursuant to Sections 102 and 103; and (3) the District Court allegedly failed to consider the elements of the claims in combination. Appellees will address WMI's arguments in succession.

### 1.    The WMI Patents' claims were routine and conventional at the time of filing

WMI relies upon a tortured reading of *Content Extraction* to argue that the District Court erred by failing to use the specific words "at the time of filing."[105] WMI fails to cite one case requiring a district court to explicitly use the words "at the time of filing." Instead, WMI cites to *Content Extraction*, stating that this Court "stressed" that what is routine, conventional or generic must be judged "at the time of filing."[106] WMI incorrectly interprets *Content Extraction* to argue that this Court requires the words "at time of filing" in district court opinions.[107]

---

[105] Opening Brief at 25 (citing *Content Extraction*, 776 F.3d at 1348).
[106] Opening Brief at 25 (citing *Content Extraction*, 776 F.3d at 1348).
[107] WMI's argument is also in tension with its claim that the District Court was in fact performing an invalidity analysis, addressed in Section III.C.2. below, because an invalidity analysis is necessarily performed at the time of patent filing, or even a year before. *See* 35 U.S.C. § 102 (providing that novelty is accessed at the effective

At oral argument, the *Content Extraction* panel discussed generally the fact that the patents-at-issue did not claim to invent the physical item – a scanner – but instead that the patents-at-issue made use of generic scanners and that the plaintiff-appellant did not claim that said scanners were novel.[108]  The *Content Extraction* panel considered how "all of the additional limitations in the claims cited in CET's appeal brief recite well-known, routine, and conventional functions of scanners and computers," and found that "while these claims may have a narrower scope than the representative claims, no claim contains an 'inventive concept' that transforms the corresponding claim into a patent-eligible application of the otherwise ineligible abstract idea."[109]  This is precisely how the District Court in the instant case handled its analysis, finding that the WMI Patents "are not tied to any particular novel

---

filing date of the invention and providing a one year exception for certain disclosures); 35 U.S.C. § 103 ("A patent for a claimed invention may not be obtained … if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains.").

[108] *Content Extraction*, 776 F.3d at 1348-49; Oral Argument at 3:35–3:55; 16:12–16:17, *Content Extraction*, 776 F.3d 1343, *available at* http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2013-1588.mp3.

[109] *Content Extraction*, 776 F.3d at 1349.

machine or apparatus, only a general purpose computer, general communication devices, and general vehicles."[110]  The District Court appropriately applied this rule.

WMI also cites *In re BRCA1- and BRCA2- Based Hereditary Cancer Test Patent Litigation* to support its argument that the District Court erred by not using certain language, but that case does not stand for this argument.[111]  Instead, it highlights another flaw in WMI's argument: WMI has not – here or at the District Court – even challenged whether the elements of the claims are "well-understood, routine, and conventional."[112]  WMI does not make this challenge for one reason: it cannot.  Instead, it relies upon a labored reading of case law in order to make a legal argument, while ignoring the facts.[113]

The District Court's analysis was not confused.  The District Court correctly held that WMI Patents' claims "are not tied to any particular novel machine or apparatus, only a general purpose computer, general communication devices, and general vehicles."[114]

_____

[110] JA21 (Decision at 19).
[111] *See In re BRCA1- and BRCA2- Based Hereditary Cancer Test Patent Litig.*, 774 F.3d 755, 764 (Fed. Cir. 2014).
[112] *Id.* at 764.
[113] WMI also relies upon *PC Connector Solutions LLC v. Smartdisk Corp.*, 406 F.3d 1359, 1363-64 (Fed. Cir. 2005).  In *PC Connector*, this Court considered the term "conventional" in regards to a claim construction dispute, which is unrelated to the matter currently before this Court.
[114] JA21 (Decision at 19).

### 2. The District Court did not conflate its Section 101 analysis with an invalidity analysis

It is WMI, not the District Court, that wrongfully conflates Section 101 analysis with an invalidity analysis. WMI cites *Environmental Designs, Ltd. v. Union Oil Co.*, but that case does not consider Section 101. It considers novelty or lack of novelty in the context of whether an invention is obvious pursuant to Section 103. Analyzing whether the claim elements rely upon generic components is necessary in a Section 101 analysis. Step two of the *Alice/Mayo* test requires that the court determine if there are additional claim elements that, either in isolation or in combination, introduce an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application.[115] The District Court correctly found that "the claimed sequence of steps comprises only 'conventional steps, specified at a high level of generality,' which is insufficient to supply an 'inventive concept.'"[116]

WMI's argument relies upon the District Court using the word "novel."[117] This only solidifies the fact that it is WMI – not the District Court – that confuses Section 101 and invalidity. For example, in *Ultramercial II*, this Court reasoned that

---

[115] *Alice*, 134 S. Ct. at 2357.
[116] JA20 (Decision at 18) (citing *Alice*, 134 S. Ct. at 2355).
[117] Opening Brief at 26.

the patent-at-issue did not include an inventive concept because the claims were not tied to a *novel* machine.[118] Here, like in *Ultramercial II*, the WMI Patents are directed toward an abstract idea and fail to include additional features that are not merely well-understood, routine, or conventional.[119]

### 3. The District Court considered the elements of the WMI Patents' claims in combination and still found the claims to be unenforceable

The District Court considered the elements of the claims as a combination.[120] WMI is incorrect in claiming otherwise. WMI then asserts that the WMI Patents' claim "combinations of hardware, software, mechanical, and communications components [that] add up together to inventive concepts that improve an existing technological process," focusing on how the WMI Patents allegedly make the

---

[118] *Ultramercial II*, 772 F.3d at 716-17.

[119] *Id.* at 715-16.

[120] *See, e.g.,* JA14 (Decision at 12) ("[W]e must determine whether the claims contain an element or *combination of elements* that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself.") (emphasis added) (internal quotations omitted); *id.* at 18 ("None of the 5 steps in claim 9 of the '789 patent or the 4 steps in claim 32 of the '291 patent, *viewed both individually and as an ordered combination*, transform the nature of the claim into patent-eligible subject matter.") (emphasis added) (internal quotations omitted).

abstract idea more efficient or run more quickly.[121]  However, merely adding speed or efficiency through the use of computer functionality "does not confer patent eligibility on an otherwise abstract idea."[122]  "To salvage an otherwise patent-ineligible process, a computer must be integral to the claimed invention, facilitating the process in a way that a person making calculations or computations could not."[123]

In support of its argument, WMI cites to *TQP Development*.[124]  *TQP Development*, however, is distinguishable based upon WMI's own block quote because the patent-in-suit claimed making computer communication more secure, not automating a well-known, long-standing set of human actions:

> This case, however, involves a way of making computer communication itself more effective by making that communication more secure . . . it involves a specific system for modifying data that

_____

[121] Opening Brief at 27-29 ("[T]he ability to detect process inefficiencies, facilitate billing, and plan yard activities"; "real-time tracking"; "real-time container monitoring"; "allows tracking to take place effortlessly").

[122] *Intellectual Ventures I LLC v. Capital One Bank (USA)*, No. 2014-1506, 2015 WL 4068798, at *5 (Fed. Cir. July 6, 2015); *see also Planet Bingo*, 576 Fed. App'x at 1006-07 (affirming the district court's decision that the claims added noting more than "the ability to manage … Bingo more efficiently" and were therefore unpatentable); *Bancorp*, 687 F.3d at 1278 ("[T]he fact that the required calculations could be performed more efficiently via a computer does not materially alter the patent eligibility of the claimed subject matter.").

[123] *Bancorp*, 687 F.3d at 1278.

[124] *See, e.g.* JA703-717 (*TQP Development, LLC v. Intuit, Inc*., No. 2:12-CV-180-WCB (Feb. 19, 2014 E.D. Tex) (J. Bryson sitting by designation).

has equally concrete and valuable effects in the field of electronic communications.[125]

The WMI Patents, like the patents in *Alice, Mayo, Bilski,* and the other cases this Court has affirmed after a Section 101 analysis, fail to do exactly what is described in *TQP Development*.[126]  The WMI Patents "do not purport to improve the functioning of the computer *itself* … [n]or do they effect an improvement in any other technology or technical field."[127]  The WMI Patents do not, for instance, teach how to program existing computers to improve their performance or even achieve any of the claimed results.[128]  Instead, the WMI Patents acknowledge that the

---

[125] *See, e.g.* JA716 Opening Brief at 27-28 (citing JA716 (*TQP Development*, slip. op. at 14)).

[126] *See, e.g.*, *Alice*, 134 S.Ct. at 2351 ("Viewed as a whole, these method claims simply recite the concept of intermediated settlement as performed by a generic computer. They do not, for example, purport to improve the functioning of the computer itself or effect an improvement in any other technology or technical field. An instruction to apply the abstract idea of intermediated settlement using some unspecified, generic computer is not 'enough' to transform the abstract idea into a patent-eligible invention.") (citing *Mayo*, 132 S. Ct. at 1297); *Bilski*, 130 S. Ct. at 3230 ("[T]he prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of the formula to a particular technological environment or adding insignificant postsolution activity.") (internal quotations omitted).

[127] *Alice*, 134 S.Ct. at 2359 (emphasis added).

[128] *See SmartGene, Inc. v. Advanced Biological Labs., SA*, 555 F. App'x 950, 955 (Fed. Cir.), *cert. denied*, 135 S. Ct. 58 (2014) (finding patent claim ineligible under Section 101, emphasizing that "It calls on a computer to do nothing that is even arguably an advance in physical implementations of routine mental information-comparison and rule-application processes. In this context, the concern about

claimed system is the same combination of conventional and generic components used in the prior art, but now limited to a shipping yard.[129] This is not sufficient to confer patent eligibility pursuant to Section 101.

As discussed above, mere utilization of a data input terminal to a switching vehicle or the use of code scanners and RFID tags for faster or more efficient tracking of container locations does not equate to a machine that is integral in the performance of the claimed invention, required to satisfy the machine test under present law.[130] Further, the addition of user terminals capable of producing reports so as to provide the ability to detect process inefficiencies, facilitate billing, and plan yard activities is similarly not sufficient to confer patentability. The WMI Patents do not claim any reporting program, billing program, analysis program, or planning program as argued in WMI's brief.[131] Instead, the WMI Patents teach that the

---

preempting public use of certain kinds of knowledge, emphasized in *Mayo*, is a grave one.")

[129] JA89 ('789 Patent at 5:45-51); JA73 ('291 Patent at 13:7-8) ("Containers are commonly tracked in transit by satellites or other electronic signaling and tracking devices.").

[130] See Section III.C.3. above.

[131] *See, e.g.*, JA89 ('789 Patent at 6:34-38) ("This data may be correlated with an *independent accounts payable program* (for example resident in a customer MIS) whereby payments from a customer to a carrier can be authorized by the data from the CMCS.") (emphasis added); JA69-70 ('291 Patent at 6:64-67-7:1).

claimed invention is interoperable with other computing systems such as generic management information systems (MIS) commonly used in the industry.[132] The specification of the '789 Patent expressly acknowledges that such activity is routine and conventional:

> As well known in the business management and computing arts, an MIS generally includes a set of data collection, analysis and reporting tools which support decision making needs. A computerized MIS generally includes a database accessible by a computer programmed with data analysis and reporting software to generate informational reports to management personnel.[133]

Moreover, the WMI Patents do not involve specific systems for modifying data, such as specially configured computers, software programs or algorithms, or other technical components.[134] In many cases, for example, Claims 9 to 19 of the

---

[132] JA89 ('789 Patent at 5:33-51).

[133] JA89 ('789 Patent at 5:45-51).

[134] Although WMI argues otherwise, mere recitation to well-known data processing software does not transform these components into a special purpose computer. *See Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012) (holding computer components generic because there was no algorithm or mathematical formula disclosed to perform the method, and the claims were silent as to how the computer hardware and database were specially programmed to perform the steps claimed in the patent); *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1316 (Fed. Cir. 2011) ("Those cases involved specific functions that would need to be implemented by programming a general purpose computer to convert it into a special purpose computer capable of performing those specified functions."); *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999) ("In a means-plus-function claim in which the disclosed structure is a computer, or microprocessor,

'789 Patent and Claims 32 to 35 of the '291 Patent, the claims include no field of use limitations requiring the use of a computer or other device at all, and could be performed with wholly human skill and human memory or by the use of a pen and paper.[135] The specifications of the WMI Patents not only state that data identification and input can be accomplished by a human operator,[136] but also emphasize how a variety of other communication mediums can be used: "In accordance with other aspects of the invention, *a variety of communications mediums can be used* to update the data in the system including but not limited to telephone, radio and portable RF scanners."[137]    There is nothing unique or special about any of the physical components, such as a data input terminal, code scanners, RFID tags, mainframe

_____

programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm.").

[135] *See e.g.*, JA91 ('789 Patent at claims 9-10) (reciting steps of identifying carriers and containers; recording container identification codes, load status, and location; moving containers; reporting load status; defining a monitoring boundary; communicating container movement; monitoring container load status and racks; entering data into container monitor control system; verifying recorded container locations; and generating reports without limitation to computer); *see also* JA76-77 ('291 Patent at claims 32-35) (reciting steps of identifying containers; recording container information; and providing a graphical representation without limitation to a computer).

[136] JA89 ('789 Patent at 5:18-19); JA69 ('291 Patent at 5:41-44).

[137] JA87-89 ('789 Patent at 2:58-61; 5:14-32); JA69 ('291 Patent at 5:41-51).

computer, centralized database, or user terminals - all of which existed in the prior art. They are simply said to do what such devices do. Moreover, the WMI Patents do not describe any unique way the components connect or function in combination.[138] The claims use generic technology – running conventional prior art software – to carry out the abstract idea of monitoring and reporting the location and load status of containers. That the components are connected to a network does not make such use inventive.[139] The claimed combinations simply consist of routine, well-known activity lacking any inventive concept.

The WMI Patents attempt to claim a monopoly on an abstract idea without including anything that could qualify as an "inventive concept," and the District Court rightfully found them unpatentable pursuant to Section 101.[140]

---

[138] JA89 ('789 Patent at 5:45-51); JA67 ('291 Patent at 1:42-47) ("Tracking of containers is well developed including the use of satellites and other electronic technology to obtain real-time data on in transit locations. Inventory accounting and management is also a well-developed [field] in which the contents of very large warehouses are ascertainable to high level of detail at any point in time.").

[139] *buySAFE*, 765 F.3d at 1355 ("That a computer receives and sends the information over a network—with no further specification—is not even arguably inventive.").

[140] WMI later asserts that it is integrating "conventional yard management operations by adding a combination of physical equipment and real-world process steps, not mental exercises." Opening Brief at 28. Surely, WMI is not claiming that the WMI Patents claim an invention of using RFID tags or "switching" vehicles in a container yard. This is not the invention, as can be seen from even a cursory review of the WMI Patents – or as discussed *supra*.

## CONCLUSION

For the foregoing reasons, the WMI Patents are unenforceable pursuant to Section 101 and the District Court order should be affirmed.


Respectfully submitted,

HOLLAND & KNIGHT LLP

Dated:  September 14, 2015


/s/ *R. David Donoghue*

R. David Donoghue
Anthony J. Fuga
131 South Dearborn Street
30th Floor
Chicago, IL 60603
Tel: (312) 263-3600
Fax: (312) 578-6666
david.donoghue@hklaw.com
anthony.fuga@hklaw.com

Cindy N. Pham
633 17th Street
Colorado Plaza Tower 1
Suite 2300
Denver, CO 80202
Tel: (303) 974-6651
Fax: (303) 974-6659
cindy.pham@hklaw.com


*Attorneys for Defendants-Appellees*

43

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 14, 2015, I filed the above paper entitled **Brief Of Defendants-Appellees Maher Terminals, LLC and Global Terminal & Container Services, LLC** with the Clerk of Court using CM/ECF system which will send notification of such filing via electronic mail to all counsel of record.

<u>/s/ <em>R. David Donoghue</em>         </u>
R. David Donoghue

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i). The brief contains 10,190 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief was prepared using MS Word in Times New Roman font, a proportionally spaced typeface, in 14-point.

Dated: September 14, 2015                HOLLAND & KNIGHT LLP

/s/ *R. David Donoghue*
R. David Donoghue
Anthony J. Fuga
131 South Dearborn Street
30th Floor
Chicago, IL 60603
Tel: (312) 263-3600
Fax: (312) 578-6666
david.donoghue@hklaw.com
anthony.fuga@hklaw.com

Cindy N. Pham
633 17th Street
Colorado Plaza Tower 1
Suite 2300
Denver, CO 80202
Tel: (303) 974-6651
Fax: (303) 974-6659
cindy.pham@hklaw.com

*Attorneys for Defendants-Appellees*